**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| TOMMY DAVID BURTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.   3:14cv1238-WHA |
| | ) | |
| EAST ALABAMA LUMBER CO., INC., | ) | (wo) |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #23), filed by the Defendant on November 2, 2015.

The Plaintiff filed a Complaint in this case on December 22, 2014, bringing claims of race discrimination in violation of 42 U.S.C. § 1981 (Count I); retaliation, also in violation of 42 U.S.C. § 1981 (Count II), and a §1981 racially-hostile work environment claim (Count III).

The court has federal question subject matter jurisdiction over the Plaintiff's claims.   28 U.S.C. §1331.

For the reasons to be discussed, the Motion for Summary Judgment is due to be DENIED.

**II.   SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and    . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B).   Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most

favorable to the non-movant:

The Plaintiff, Burton, an African-American male, was employed with Defendant East Alabama Lumber Co., Inc. ("EAL"). EAL has a sawmill where trees are reduced to rough lumber. During the process of cutting trees into rough lumber, debarked logs with the edges cut off are called cants. The cants are transferred to a gang saw which cuts the cants into lumber. The gang saw machinery is called a gang transfer station. Once the pieces are cut, they are dried and sorted.

Burton was initially hired as a laborer at EAL in May of 2013. He was moved to operator in July of 2013 and received a raise. At the time of his discharge in June of 2014, he was operating the old gang transfer station.

Tommy Gaberlavage ("Gaberlavage") was the plant Manager during the relevant time and had four supervisors who reported to him. Burton believed his immediate supervisor to be Doug Ewell ("Ewell").

Burton did not experience any race-related issues or problems at EAL until January of 2014. Burton has provided evidence that between January of 2014 and June of 2014, when his employment ended, he was subjected to racial slurs. Burton has stated in his deposition that he had a run-in with James Gasaway ("Gasaway"), a supervisor, in January of 2014 in which Gasaway stated, "Sooner or later, boy, I am going to have your job." (Doc. #23-2 at p.162:22-163:1). A month later, Gasaway said, "Nigger, I am going to have your job." Gasaway called Burton that severe racial epithet two additional times. Although Gasaway was a supervisor at EAL, he stated in his deposition that he was not Burton's supervisor. (Doc. #23-4 at p. 32:14-19). Gasaway stated that Ewell and Gaberlavage were Burton's supervisors.

In another exchange with Gasaway, Gasaway told Burton that Ewell wanted Burton to

train another employee for the job, and when Burton said that Ewell had not mentioned training that employee, Gasaway stated, "Boy, you just ain't going to do right, is you?"  To which Burton responded that he would not train anybody on the machine unless asked to do so by his supervisor.

Burton states in his deposition that he told Gaberlavage that Gasaway used a racial epithet and Gaberlavage told him to let it roll off his back.  Burton also complained to Ewell about Gasaway.

Burton overheard Ewell say to Gasaway after Burton complained to Ewell about Gasaway, "We got to get this nigger out of here" (Doc. #23-2 at p.186:5-9).  Ewell also commented, "I wish this nigger would hurry up," when Burton and another employee were working to repair a chain. (Doc. #23-2 at p.251:1-4).  Ewell also walked by Burton and said, "nigger." (Doc. #23-2 at p. 202:4-16).  Burton additionally states that he was exposed to racial graffiti whenever he used the bathroom stalls in the only bathroom at the mill. (Doc. #23-2 at p.242-243).  Finally, Burton states that he saw an image of Ewell in a Ku Klux Klan outfit on Ewell's phone as Ewell was showing the image to Gasaway.

Burton was terminated and replaced as the operator of the old gang saw transfer station by a Hispanic man.  Gaberlavage made the decision to terminate Burton's employment.  Ewell was also involved in the decision to terminate Burton's employment. (Doc. #23-3 at p. 5).  EAL states that Burton was fired for not meeting productivity expectations, breaking machinery, and not following directions from his supervisor.  Burton has testified that he was initially told that he was being laid off due to lack of work, and he disputes that he had productivity issues at EAL.

## IV. DISCUSSION

### A.  Race Discrimination

The first issue raised is whether Burton has sufficient evidence to establish a direct

evidence case of race discrimination in termination.

Direct evidence is evidence which, if believed, would prove the existence of the fact without an inference or presumption. *Carter v. City of Miami*, 870 F.2d 578, 581,-82 (11th Cir. 1982). Only the most blatant remarks whose intent could mean nothing other than to discrimination on the basis of an impermissible factor constitute direct evidence of discrimination. *Wilson v. B/E Aerospace, Inc*., 376 F3d 1087, 1086 (11th Cir. 2004). Burton points to statements made by Gasaway and Ewell as being direct evidence of race discrimination.

EAL responds that Gaberlavage was the decision maker at EAL and there is no evidence he terminated Burton because of his race. While Burton does not point to racial statements made by Gaberlavage, he does rely on a racial statement made by Ewell, and the Answers to Interrogatories provided to the court state that Ewell was also involved in the decision to terminate Burton's employment. (Doc. #23-3 at p.5). The statement attributed to Ewell, which Burton overheard Ewell make and contends is direct evidence of discrimination, is, "We got to get this nigger out of here."

"Remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L., Serv., Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998). Racial epithets can be considered direct evidence of discrimination when they are directed at terminated employee at the time of discharge. *See Lamothe v. Bal Harbour 101 Condominium Ass'n, Inc*., 316 F. App'x 844, 846 (11th Cir. 2008) (finding the following statement made contemporaneously with a discharge to be direct evidence "Lamothe should 'get a job at $6.50 at McDonald's like the other niggers.").

5

Ewell's statement was not directed to Burton, and was not made contemporaneously with Burton's termination.   In fact, an inference must be drawn to conclude that Ewell is referring to Burton.   The court concludes, therefore, that the evidence pointed to by Burton in the form of statements by decision maker Ewell are not direct evidence of discrimination.

Where, as here, the plaintiff seeks to prove intentional discrimination on the basis of race under § 1981 by using circumstantial evidence of intent, the court applies the framework set out for Title VII cases by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   *See Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010). Under this framework, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.   After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action.   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).   The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."   *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).   A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.   *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).   That is, even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case."   *Chapman v. AI Transport*, 229 F.3d

1012, 125 n.11 (11th Cir. 2000).

The elements of a prima facie case of race discrimination in termination are (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position at issue; (3) the plaintiff was discharged despite his qualification; and (4) the plaintiff was subject to differential treatment, that is, he was either (a) "a member of a protected class . . . but was fired and replaced by one outside the protected class" or (b) a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged.  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

EAL challenges only one element of the prima facie case, the fourth, arguing that Burton was replaced by another minority because Burton was replaced by a Hispanic man.  While replacement by a non-minority would establish a prima facie case, Burton does not have to prove that a non-minority replaced him.  Burton's burden is to show that he was in a protected class and that he was replaced by a person outside of that protected class.  *Nix,* 738 F.2d at 1185.  Courts have concluded that a prima facie case is established if a plaintiff is African-American and is replaced by a Hispanic person. *Shazor v. Professional Transit Management, Ltd*., 744 F.3d 948, 957 (6th Cir. 2014) (stating "Plaintiff is African American and Crews is Hispanic. Absent more extensive evidence on the subject, these two facts are enough to establish that Plaintiff was replaced by someone outside her protected racial class."); *see also McCrea v. Traffic Control Products of Florida, Inc.*, No. 2:12cv557-FTM-23CM, 2014 WL 4071670, at *3 n.4 (M.D. Fla. Aug. 18, 2014) (finding that a Hispanic employee is a proper comparator for an African-American employee).  The court concludes, therefore, that Burton has established a prima facie case of race discrimination in termination.

EAL's articulation of a legitimate, non-discriminatory reason is that it terminated Burton

because he could not meet the production expectations, he would not follow directions, and he damaged equipment or machinery by leaving it on and not maintaining an even flow of cants.

Burton contends that EAL has not articulated a legitimate, non-discriminatory reason because EAL has only produced generalized claims that Burton was not productive with no evidence as to what productivity is, that EAL has not shown that any broken equipment was other than usual, and that there was no instance of Burton failing to follow instructions that occurred other than when Burton was being addressed with a racial epithet.

When asked in his deposition why he decided to terminate Burton's employment, Gaberlavage answered, "Just could not make production with this job. That's the reason."  (Doc. #23-1 at p.77: 9-12).   In the same deposition, however, Gaberlavage also said the Burton would get the logs crossed up.   (Doc. #23-1 at p.71:14-18).   He also stated that he fired Burton because Burton did not want to take directions. (Doc. #23-1 at p.76: 3-11).   Ewell testified that he recommended that they find somebody that could operate the machine correctly.   (Doc. #23-5 at p.36:20-37:1).

The court must conclude that EAL has sufficiently articulated reasons for Burton's discharge.   In light of this, Burton must now create a genuine issue of material fact as to whether the reasons advanced are pretextual.   Burton may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Standard v. A.B.E.L. Services, Inc*., 161 F.3d 1318 (11th Cir. 1998) (citations omitted).

Burton argues that no one associated with EAL has been able to identify what the production goals are or how Burton failed to meet them.   Burton provides a Declaration from Richard Ford ("Ford"), a former employee of EAL, in which he states that Burton did a good job

compared to other operators on the old gang transfer which Ford had seen, and that the mill production ranged from 260,000 to 300,000 board feet per day. (Doc. #26-1). LeRoy Reeves ("Reeves"), a current employee of EAL, states in a Declaration that when Burton was the operator of the old gang transfer, mill production ranged from 260,000 to 300,000 board feet per day and production currently is 220,000 to 230,000 feet per day. (Doc. #26-1 at p.54). Gasaway stated in his deposition that the production goal was 280,000 board feet per day. (Doc. #23-4 at p.19.3-9). Burton also has said that Ewell told him he did an excellent job. (Doc. #23-2 at p.249: 2-3). Burton further testified that he had not been reprimanded regarding his job duties, no one told him that he was not meeting productivity goals, or that they had problems with his job performance. (Doc. #23-2 at p.237:11-19). In reply, EAL provides a new Declaration of Ford in which he states that production numbers have "nothing to do with any single employee at EAL." (Doc. #27-1).

As to the issue of broken equipment, Burton argues that there is no evidence that Burton damaged equipment, and that mill equipment occasionally breaks down. Reeves testified in his Declaration that he never saw the old gang transfer being down for maintenance more often when Burton was the operator. (Doc. #26-1 at p.54). Ford also stated that when he worked at EAL his job involved working on machines that broke down or needed maintenance and that he never observed the old gang transfer being down for maintenance more often when Burton was the operator. (Doc. #26-1 at p.50).

As to the issue of failing to follow instructions, Burton states that EAL has pointed to altercations with Gasaway as evidence that Burton would not follow instructions of his supervisor. Gasaway, however, testified that he was not Burton's supervisor. (Doc. #23-4 at p.32:14-17). EAL also points to Ford's new Affidavit in which he state that Burton had issues with following directions. (Doc. #27-1).

9

In addition to presenting evidence which he contends calls into question the reasons articulated by EAL in support of its motion, Burton also argues that EAL has not been consistent in explaining why his employment ended. Burton stated in his deposition that at the time his employment ended, Gaberlavage said, "I am not firing you, I am laying you off," and when Burton asked whether he could have his old job as laborer back, Gaberlavage told him he was making cutbacks. (Doc. #23-2 at p.226: 16-227:2). Burton also provides evidence in the Notice of Claim and Request for Separation Information filed with the State of Alabama, Department of Labor, on which it states that Burton's employment ended due to "lack of work," not "discharge." (Doc. #26-1 at p.47).

The identification of inconsistencies in an employer's testimony can be evidence of pretext. *See Bechtel Construction Co. v. Secr. of Labor*, 50 F.3d 926 (11th Cir.1995), and *Howard v. BP Oil Co., Inc*., 32 F.3d 520, 526-27 (11th Cir.1994). To be considered evidence of pretext, it is not enough that the employer's explanations for an employment decision have shifted, but instead there must be inconsistencies in the reasons offered. *Zaben v. Air Products & Chemicals, Inc*., 129 F.3d 1453, 1458 (11th Cir. 1997) (stating that "[a]lthough the company gave differing explanations for the selection of employees to be discharged, saying on the one hand that seniority played no role in the process and that only an employee's performance was considered while, on the other hand, asserting that Lewis was discharged because he had the least seniority, its reasons are not, as the district court observed, necessarily inconsistent."). An additional, but undisclosed, reason for the decision, does not, however, prove pretext. *Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998).

EAL has not provided an explanation in its reply brief for the difference in description of Burton's separation from employment. While there may be an explanation which would not

undermine the reasons articulated in the testimony, at this point in the proceedings, the court has been offered evidence that Burton was told he was being laid off for lack of work and due to cutbacks, but during the pendency of this case, EAL has taken the position that Burton's performance was lacking, he broke equipment, and did not follow directions.   This is not a case in which the employer merely added new, previously-undisclosed reasons for termination.   Viewing the evidence in a light most favorable to the non-movant, this is a case in which the employer initially stated that the employee was being laid off, and made that representation in a document filed with the State of Alabama, but the decision makers later testified in a deposition that the employee had in fact been terminated for performance issues.   In the absence of any explanation offered for this inconsistency, viewing the evidence in a light most favorable to the non-movant, the court concludes that a question of fact has been raised as to whether the articulated reasons were the real reasons for Burton's termination, and that summary judgment is due to be denied.

B.   Retaliation

Burton does not contend that he has direct evidence of retaliation, but argues instead that he has provided sufficient evidence to establish a circumstantial evidence case of retaliation.   To prove a retaliation prima facie case, a plaintiff must show that (1) he engaged in a statutorily-protected activity, (2) he suffered a materially-adverse employment action, and (3) there is a casual connection between the protected activity and the materially adverse action. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

EAL acknowledges that Burton has testified that he reported Gasaway's use of racial slurs to Ewell and Gaberlavage.   EAL argues that Burton did not complain about every instance of racial language he experienced, but EAL does not dispute that the complaints Burton did make are protected activity.   EAL argues that even accepting that Burton complained to Ewell in February

11

and Gaberlavage in April, EAL has articulated the legitimate, non-discriminatory reasons for his termination in June which were discussed above.

The same reasoning discussed above as to the questions of fact raised about whether the proffered reasons were actually the motivation for his discharge also applies to the retaliation claim. Accordingly, the court concludes that summary judgment is due to be denied as to the retaliation claim as well.

## C. Hostile Work Environment

To establish a claim for a racially-hostile work environment, a plaintiff must show that he is a member of a protected class, that he was subjected to unwelcome harassment, that the harassment was based on his race, that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment, and that the employer is responsible for the environment under a theory of either vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Burton points to the following as evidence of racial harassment also set out above: in January of 2014, Gasaway told Burton, "Sooner or later, boy, I am going to have your job" (Doc. #23-2 at p.162:22-163:1); one month later, Gasaway told Burton, "Nigger, I am going to have your job" (Doc. #23-2 p.164: 17-18); in March 2014, Gasaway told Burton, "Look, I don't care if your son was here, I got a job to do and nigger, this is what we are going to do;" in April, 2014, Gasaway referred to Burton as "boy," twice and Gasaway said "I am going to have your job and get your black ass fired, Nigger."  (Doc. #23-2 at p.178: 1-4).  Burton states in his deposition that he told Gaberlavage that Gasaway had used a racial epithet, and that he had reported the conduct to Ewell who did not do anything about it. Burton testified in his deposition that during that

conversation Gaberlavage told him sometimes "you have to let stuff roll off your back."(Doc. #23-2 at p.183:1-5).   Burton also overheard Ewell, his supervisor, say to Gasaway after Burton complained to Ewell about Gasaway, "We got to get this nigger out of here" (Doc. #23-2 at p.186:5-9).   Ewell also commented, "I wish this nigger would hurry up," when Burton and another employee were working to repair a chain. (Doc. #23-2 at p.251:1-4).   Ewell also walked by Burton and said, "nigger." (Doc. #23-2 at p. 202:4-16).   Burton also states that he was exposed to racial graffiti whenever he used the bathroom stalls in the only bathroom at the mill. (Doc. #23-2 at p.242-243).   Finally, Burton states that he saw an image of Ewell in a Ku Klux Klan outfit on Ewell's phone as Ewell was showing the image to Gasaway.

Burton relies on *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014), to support his argument that he has sufficiently established a claim of a racially-hostile work environment.   In *Austal*, the Eleventh Circuit concluded that a question of fact as to creation of a racially- hostile work environment had been created where an employee who worked for the employer for about one year saw a coworker wear a shirt with a Confederate flag, regularly saw racist graffiti in the restroom, reported the graffiti to his supervisor and was told if he did not like it he could quit, his supervisor carved "porch monkeys" into aluminum where they were working it and then sanded it off, and his supervisor yelled at him that he was not a racist on the day the employee quit his job.   754 F.3d at 1253-54.   The court reasoned that the harassment was frequent and severe because he saw the racist graffiti "regularly" and his supervisor humiliated him with a racist slur.   *Id.* at 754.

The evidence Burton has pointed to, that within the span of a few months, he was subject to conduct including being called a severe racial epithet more than one time by a person who may or may not have been Burton's supervisor but who nonetheless gave Burton work directions, being

13

called "boy" by the same supervisor on several occasions, hearing his own supervisor to whom he voiced a complaint use the same racial epithet more than once, seeing racist graffiti whenever he went into the restroom stalls, and seeing a picture of his supervisor in a Ku Klux Klan outfit, is similar in severity and pervasiveness to the conduct, and is therefore sufficiently severe or pervasive to constitute a hostile working environment under the reasoning, in *Austal*.

EAL argues that Burton cannot prove that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment because Burton himself testified in his deposition that he might have felt threatened by comments but they never interfered with his work. (Doc. #23-2 at p.170-73). Harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable, however. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002). "Eleventh Circuit precedent mandates that courts consider 'the totality of the circumstances' such that the absence of one factor (such as unreasonable interference) is not dispositive." *Hedgeman v. Austal, U.S.A.*, L.L.C., 866 F. Supp. 2d 1351, 1364-65 (S.D. Ala. 2011) (concluding that the plaintiff having established the frequency, severity and the humiliating and demeaning nature of the conduct, the weak demonstration of how the conduct interfered with his job is not fatal to his claim). Summary judgment is, therefore, due to be denied as to the racially-hostile work environment claim.

## V. CONCLUSION

For the reasons discussed, accepting the Plaintiff's version of the facts as true for summary judgment purposes, the court finds that there are genuine issues of material facts as to each claim, which must be resolved by a jury. Therefore, the Motion for Summary Judgment is due to be and is hereby ORDERED DENIED.

Done this 17th day of December, 2015.

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE